183 So. 191

## MOUILLE v. SCHUTTEN.

### No. 34863.

June 27, 1938.

Dissenting Opinion July 11, 1938.

Rehearing Denied Aug. 5, 1938.

Montgomery & Kehl, James J. Landry, and Robert A. Ainsworth, Jr., all of New Orleans, for appellant.

A. I. Kleinfeldt, of New Orleans, for appellee.

HIGGINS, Justice.

This is an action by the wife against her husband for a separation from bed and board on the ground of alleged cruel treatment, for the custody of her minor daughter, for $150 a month alimony and for an attorney's fee of $150.

The defendant denied the charges of cruelty and that his wife should have custody of their daughter, and, in a reconventional demand, asked for a separation, a mensa et thoro, on the ground that his wife was guilty of such cruel treatment as to render their living together insupportable, and that, because of her misconduct, the child should be permitted to remain in the Academy of Holy Angels, where she had been placed by him. During the pendency of the suit, the wife filed a rule to show cause why she should not be awarded the custody of the child and alimony pendente lite, which rule was made absolute, the alimony being fixed at the rate of $25 per month. Later the case was tried on the merits and judgment was rendered in favor of the wife, decreeing a separation from bed and board and awarding her the permanent care, custody and control of their minor daughter, and alimony at the rate of $25 per month. The defendant appealed suspensively and the plaintiff answered the appeal, praying that the judgment be amended to allow her an attorney's fee of $150.

Plaintiff alleged in her petition that she was married on September 28, 1926; that a child was born on February 6, 1928, and that she separated from her husband on August 15, 1936; " * * * that over a long period of time her husband continually mistreated and abused her, beat her and applied to her vile and insulting epithets;" that "from August 1, 1936 to August 15, 1936 petitioner's said husband refused to speak to petitioner and on August 1, 1936, petitioner's said husband, without cause or provocation, became abusive, cursed petitioner, struck her, called her (a) 'stupid and ignorant', told her that she was no good, that she and her family were all no good and a bunch of drunkards and forced petitioner to leave the house, and petitioner shows that she has lived separate and apart from him continuously since that time; and that "on March 14, 1937, petitioner called at the home of her said husband for the purpose of seeing her minor child, who was then sick and while there her said husband and his mother cursed and abused petitioner, threatened her and forced her to leave the house;" and that her husband "is engaged in business in the City

of New Orleans and earns in excess of $300.00 per month, and petitioner desires and is entitled to be granted alimony in the sum of $150.00 per month;" and that petitioner is "without means to hire an attorney to represent her" and she desires that her husband be ordered to pay her said attorney the sum of $150, as a reasonable fee for representing her in this suit.

In his answer, defendant admitted the dates of the marriage, the birth of their daughter, and the separation, but denied the charges of cruelty and mistreatment, averring that he had done everything in his power to make his wife comfortable and happy but that she had conducted herself in such a manner as to make living with her insupportable.

As plaintiff in reconvention, he alleged that on June 10, 1936, his wife went to Lake Dautrieve, Louisiana, on a vacation, leaving the child with him, stating that she did not know whether she was coming back; that during the last week of July 1936, she returned home and stayed for about three weeks; that on the fourth day after her return home, she informed him that she did not love him and did not know why she ever married him, that she would rather live a lewd life than stay with him, and that she desired a divorce; that on August 16, 1936, she told him that he was not the father of their child and thereafter abandoned both of them; that, in order to properly rear and educate his daughter and give her moral and spiritual training, he placed her in the academy of Holy Angels, where she is pres-

ently living; that his daughter would suffer irreparable injury, if custody of the child were given to the mother; that on March 14, 1937, his wife returned from Lake Dautrieve and called at plaintiff's home for the purpose of taking the child, who had been removed from the Academy of Holy Angels because of illness; that he informed his wife that the child was too sick and weak to be taken out of the house and she then cursed, slapped, punched and kicked him and threatened to disgrace him; that from August 1936 to March 15, 1937, she worked as a waitress and entertainer for George Angelle, the proprietor of a bar room and restaurant at Lake Dautrieve, La., and her duties consisted of entertaining the patrons by drinking and dancing with them and serving them food in private dining rooms; that on a number of occasions she was seen going into these private rooms with a man and would close the door and remain there for a long time; that at about 10 o'clock one night, she and George Angelle went into a one room building, containing a bed, and stayed there for a long period of time; that she often went out with different men at night and returned home in a drunken stupor in the early hours of the morning; that at 12:30 o'clock on the night of June 16, 1933, upon returning home from work he met Joseph Jones, who was in a drunken condition, coming out of his home, and found his wife inside in an intoxicated state; that on or about the second Sunday of September, 1933, he caught this same man sneaking down the back stairs of his house at night and brought him back into the house

and found his wife clad only in transparent silk pajamas; that he thrashed the man and put him out of his home but until the time of their separation his wife continued keeping company with him (Jones); that on several occasions when he returned from work at night and knocked on the door his wife inquired if it were "Joe," meaning Jones; that she would frequently lock their minor daughter in the house alone at night and go out with Jones; and that his wife was intimate with Noah Gautreaux for three or four years.

The transcript consists of the testimony taken on the rule to show cause why the wife should not be granted the custody of her minor daughter and alimony, and the testimony of the witnesses taken on the trial of the case on the merits. Some of these witnesses testified in both instances.

Plaintiff testified that her husband was mean and cruel to her and compelled her to live with him as though she were a prisoner; that he would get drunk and beat her; and that on August 16, 1936, she left him because he choked her. She denied that she drank liquor or had improper relations with other men.

Mrs. Robert Mouille, plaintiff's mother, stated that on the night of August 16, 1936, her daughter came to her home crying, and that she saw red marks on her neck and back, which her daughter informed her the defendant had inflicted. She also said that defendant, in her presence, stated that he would kill his wife if she ever took their child.

Bertha Mouille, plaintiff's sister, corroborated her mother's testimony as to the visible marks on the plaintiff's neck and back.

George Angelle testified that the plaintiff worked in his cafe and restaurant at Dautrieve as a waitress and that he never saw her drink liquor or behave indecently. He denied that he had any improper relations with her and asserted that his place of business bore a good name.

Norbert Provost, a cafe and bar proprietor at Lauerville, Dr. P. H. Walet, a dentist of New Iberia, Junius Oubre, a farmer of Lauerville, and Robert Vaughn, a deputy sheriff residing at Lauerville, all testified that on a number of occasions they visited George Angelle's restaurant to dine and that they did not observe any misconduct on the part of the plaintiff, and that Angelle's place bore a good reputation, otherwise some of them would not have brought their wives and daughters there.

Barbara Mouille, a sister of plaintiff, states that she was employed as a bookkeeper and cashier at Angelle's establishment; that she did not see her sister drink, dance, or go out with men, or misconduct herself.

Miss Eva Laborde testified that she rented one side of her double house, No. 2961 Maurepas Street, New Orleans, to Mr. and Mrs. Schutten and that she lived in the adjoining half of this house; that during the eighteen months the couple occupied the premises, she was not dis-

turbed by any boisterous parties, never observed any strange men visiting Mrs. Schutten, nor had she ever seen the plaintiff drinking or in company with other men, and that she appeared to be a kind mother. On cross-examination, she admitted she had not paid any attention to what transpired next door.

The husband denied that he had ever mistreated, struck or choked his wife or gone home intoxicated. He stated that his employment required him to work at night and his wife constantly complained, because he forbade her to drink intoxicating liquors or to associate with people who would contaminate and corrupt her; that before their separation his wife often refused to go out with him and his daughter, but as soon as they would leave the house she would go out alone. He testified as to her relations with Joe Jones, as alleged in his petition, and stated that his wife explained Jones' presence on one occasion by stating that he remained to wash the dishes after a party, and on another occasion, she stated that her mother had sent Jones there with a package for her and when he opened it, it proved to be a whiskey bottle, and that he administered a sound beating to Jones and forbade his wife to ever see him again, but that she disobeyed him.

Mrs. I. Christmas, a nurse, who resided at No. 2963 Maurepas Street, and whose residence was separated from the Schutten home by a six foot alley, testified as to the time she saw Mrs. Schutten get out of a young man's automobile on Lopez and Maurepas Streets, and that on other occasions, while Mr. Schutten was at work, couples came to his home where they drank and danced and the girls were kissed and hugged by the men. She also testified that Mrs. Schutten would go out at night and leave little Dorothy alone in the house.

Miss T. M. Adams, Justice of the Peace at Grand Isle, La., and Bobbie Young, defendant's nephew, a fourteen year old boy, testified that they were present on March 15, 1937, when Mrs. Schutten insisted on taking Dorothy out of the house, although she was sick with bronchitis, and that when Mr. Schutten protested, she slapped, punched, kicked, cursed and abused him and threatened to ruin his name, and then ordered a taxi cab and left the place in a rage.

Mrs. Marie Angelle, wife of George Angelle, and a first cousin of the plaintiff, testified that there were two minor children born of her marriage; that she lived with her husband at Lake Dautrieve on a house boat, and that he operated a cafe and bar which consisted of a building erected on pilings over the water; that he employed five or six girls, who were waitresses and entertainers, and who served patrons in both capacities; that the girls were required to drink, dance and entertain the patrons; that the living quarters of these girls were in the front of the house boat and that she, her husband and their children occupied the rear portion; that plaintiff began to work for her husband in August 1936, and during the following two months she became suspicious of her husband's attentions to plaintiff by

taking her to her sleeping quarters at night, and, on one occasion she found plaintiff sitting on her husband's bed talking to him and when she appeared they abruptly stopped; that on another occasion about 11 o'clock at night, she saw her husband and the plaintiff go into a one room building, which housed the Delco lighting machinery and which contained a bed, and that they stayed there for a long time; and that she left her husband because of his relations with the plaintiff.

On the trial of the rule for the custody of the child and for alimony, Ethel McDonald, another sister of the plaintiff, who was also separated from her husband, testified that if Dorothy were given to the mother she would assist in rearing her; that she resided with her mother, who operated a boarding and rooming house; that she was employed as a waitress in New Orleans and knew Joseph Jones, who was a good friend of the family. She admitted that another married couple and a "fellow named Roy," together with Joe Jones played cards and danced several times at plaintiff's home; and that Joe Jones drove plaintiff home at night after her visits to her mother's home; she denied that she had ever seen any improprieties between plaintiff and Joe Jones.

Mrs. D. Reid, who boarded and roomed at plaintiff's mother's home before she married, stated that had gone shopping and to picture shows with the plaintiff and that she always behaved herself and treated her child kindly, and on cross-examination stated that Mr. Schutten was a good husband and father.

Mrs. Robert Mouille, plaintiff's mother, stated that the young man named Joe Jones was "a good friend of the family," and when her daughter visited her at night, while her husband was working, she would pay for the gas and have Joe Jones drive her daughter home in his Plymouth car and that she or some member of the family always accompanied them. She stated that her son-in-law threatened to kill her daughter and their child when he became despondent over the loss of his job and the fact that his baby was sick with diphtheria.

Robert Mouille, father of the plaintiff testified that he was a carpenter and laborer; that Joe Jones was "a good friend of the family" and he had never seen his daughter improperly conduct herself in the presence of this young man. He states that he did not interfere in his daughter's difficulty, and advised his son-in-law and her to try to get along peacefully together. He also stated that his son-in-law was a kind father and that he would be just as well satisfied for the child to be with him as his daughter; that on the occasion of a visit to Lake Dautrieve, he did not observe any misconduct on the part of his daughter.

Mrs. Ida Christmas testified that she saw drinking and heard cursing among the couples, in the presence of the child, at plaintiff's home on Maurepas Street; that the mother threatened to punish the child if she informed her father as to what was going on; that at times when couples were there drinking and putting their arms around one another, the shades were lower-

ed; that Mrs. Schutten once explained the presence of a young man at her home as being a relative who was visiting her, but later she learned that this was not true; that she could hear and see very well what was going on in the Schutten home, because there was only an alley six feet wide separating her place from their residence.

In the first hearing, Mrs. Angeline Gauthreaux testified that she was a widow with married children and lived with the Schuttens on Maurepas Street, earning her rent for her room by doing the washing and ironing and working elsewhere for a living; that she had seen plaintiff drinking with a man, and had also seen her in an intoxicated condition with Joe Jones in a bar room on Baronne and Melpomene Streets; that she forbade her son, Noah J. Gauthreaux, to visit her at the Schutten home, because of the improper attentions he and Mrs. Schutten paid each other; that she warned her son, because she did not want him to get in trouble but refused to divulge what had transpired between these parties to justify her in taking such action; that she had also gone to Lake Dautrieve and worked as a cook for George Angelle and saw plaintiff dancing and drinking with patrons in the cafe and bar and had also seen her go into private dining rooms alone with men; that plaintiff had also gone out alone at night with George Angelle; that she had seen her drinking several times; that Mrs. Schutten's husband had forbidden her to go with the class of people that she associated with but she disobeyed him; that on one occasion when they were on their way to the railway station at New Iberia in an automobile plaintiff sat on the lap of a man and disregarded the witness' advice to let the little girl sit on her lap and the mother sit on the seat; that one night she saw a man accompany plaintiff to her quarters at Lake Dautrieve and kiss her. On the trial of the case on its merits, this witness also testified substantially to the same effect.

Noah J. Gauthreaux, son of Mrs. Angeline Gauthreaux, stated that he was twenty-five years of age; that he became intimate with Mrs. Schutten when he was nineteen years of age and had an affair with her for about three years, or until 1932; that thereafter he introduced Mrs. Schutten to Joe Jones and that they had gone out together on drinking and dancing parties at beer gardens; that he was married and had two daughters, one nine months and the other twenty months old; that he was not summoned as a witness but decided to testify for the protection of Dorothy Schutten, whose custody the mother was seeking. On the trial of the case on the merits, this witness took the stand, but the trial judge refused to permit him to testify again.

Mrs. Daniegh Latioleis testified that she had known Mrs. Schutten for two months and worked with her at Lake Dautrieve; that their duties consisted of asking patrons for nickels to put in the victrola and to drink and dance with them; that the place was patronized by many "rough" and common men and plaintiff drank and danced with them; that one night she and the plaintiff went out with two men, became drunk and were put out of a place near

New Iberia; and that she and plaintiff had had a fight and that she was arrested, found guilty and given a suspended sentence.

Mrs. Stella Cavaller of New Orleans testified that she had known Mrs. Schutten for about four years and that they had gone out with Joe Jones and another young man on drinking and dancing parties at beer gardens and that Jones was always plaintiff's partner; that when they had such parties at the Schutten residence they always emptied the ash trays and washed the dishes so Mr. Schutten would not know what had been going on in his house.

Although the record indicates that Joe Jones resided in the City of New Orleans, and was "a good friend" of plaintiff's family, it is observed that he did not appear as a witness to deny the charges of misconduct between himself and plaintiff made by the defendant and his witnesses.

 There is no law which disqualifies a corespondent from testifying as a witness for or against the alleged wrongdoer. The trial judge was in error in refusing to hear Noah J. Gauthreaux's testimony. While he had the right to disbelieve the witness for any reason which, in his opinion, affected his credibility or showed that he was untruthful and unreliable, he had no right to decline to hear and consider his testimony solely because it is unusual and reprehensible for a man to tell of his intimacies with a woman. These would be reasons to view with caution such evidence, but as was stated by this Court with reference to the testimony of paid detectives in divorce cases where

their statements are fully supported by strong corroborative proof, the court must give effect to it. Whether or not the testimony is voluntary or involuntary, the reasons that prompted it, and all the facts and circumstances surrounding the case should be carefully considered and if it then appears that the witness has told the truth the judge cannot arbitrarily reject this type of evidence. If such a witness were summoned and forced to take the stand, he would be compelled to tell the truth or be sentenced to jail for contempt of court in refusing to testify. The only other alternative he would have would be to perjure himself and run the risk of criminal prosecution therefor. Even in capital cases, the State uses the testimony of a conspirator or an accomplice, who has been promised immunity, for the purpose of convicting the other party or parties. Such witnesses are not disqualified by law from testifying but the rule of evidence is that their statement must be corroborated and weighed with great caution before being accepted as true. Until the Legislature states that it is against the public policy of this State for a corespondent to testify against his partner in a wrongdoing, the court cannot refuse to permit him to testify or arbitrarily reject his testimony.

Counsel for the plaintiff contends that only a question of fact is involved herein and, as the trial judge heard and saw the witnesses, his finding should not be disturbed, because he was in a much better position to judge the credibility of the witnesses and the effectiveness of their statements than this Court can with only the record before it.

In the case of Fridge v. Talbert, 180 La. 937, 158 So. 209, we said (page 212):

"The statement is made in plaintiff's brief that the decision in plaintiff's favor can be sustained on no other theory than that the trial judge believed plaintiff's witness Holden. This statement necessarily implies that the trial judge disbelieved the testimony of the defendants and their witnesses. And plaintiff invokes the familiar rule that where the evidence is conflicting the findings of the trial court will not be disturbed on appeal.

"But the rule invoked applies only to those cases in which the appellate court is in doubt as to the correctness of the findings of the trial court. Where no such doubt exists, and the findings are clearly erroneous, the duty rests upon the appellate court to set them aside.

"The consideration of written testimony by an appellate court has some advantages over the hearing of oral testimony by the trial court. A written record furnishes the opportunity for a more mature consideration of the stories told by the witnesses, for detecting the inconsistencies in the statements of individual witnesses, and for sifting the conflicting statements of opposing witnesses.

"From our examination of the record, we find no warrant for disregarding the testimony of the defendants and their witnesses. The personal interest of defendants, the bias of their two negro employees, and the friendship of Vicknair for Sullivan are not to be overlooked in weighing their testimony. But the testimony should not be disbelieved on the mere assumption that the witnesses committed perjury. The presumption is that a witness on oath testifies honestly until the contrary is shown. And deliberate perjury should not be imputed even to a biased witness, except it cannot be avoided, when he testifies to a matter of fact within his personal knowledge.

"The fact that a witness is wholly disinterested offers no security against mistake. A witness is often honestly mistaken when testifying to the existence or nonexistence of a fact, and the courts must use their own reason and common sense in determining the probability or improbability of his statements.

"Where witnesses differ the courts should reconcile, if possible, the apparent contradictions their testimony presents. If this cannot be done, then the probabilities or improbabilities of their respective statements must be considered in the light of their capacity, opportunity or incentive for observation, the amount of corroboration, if any, and the degree of proof required."

In McCartan v. Filkins, 134 La. 795, 64 So. 717, the Court said:

"The only question in the case is as to the sufficiency of evidence offered in support of the adultery charged. The acts of adultery were circumstantially proved by the testimony of three detectives.

"In the absence of the reasons for judgment from the record, it is presumed that the trial judge rejected the testimony because it was given by detectives employed by the plaintiff in the cause.

"The testimony of a person employed by the husband or the wife to detect the other suspected of adultery is competent, and should not be rejected absolutely. Such is the rule of several of the courts of the Union. The law with reference thereto is laid down in 14 Cyc. p. 698, as follows:

" 'Although the testimony of a person employed to watch and detect the husband or wife suspected of adultery is competent and ought not to be absolutely rejected, it should be received with great caution, and scrupulously and minutely scrutinized, and ordinarily it should be corroborated either by the facts and circumstances in evidence, or by the direct testimony of other witnesses, or by both.'

" * * * *

"These witnesses do not testify positively, but circumstantially. Their testimony is corroborated in almost every particular by witnesses for the defendant, except to the one fact that the door of defendant's bedroom in a hotel in the city of New Orleans was closed while she was entertaining the corespondent in her bedroom. The detectives testified that the door of the room was closed, and that the light was extinguished or turned low while the co-respondent spent parts of two nights with the defendant. Their evidence being competent, and having been corroborated in almost all particulars, is entitled to consideration and weight in determining the case. In actions for divorce, courts must take such evidence as the nature of the case permits, circumstantial, direct, or positive, and bring to bear upon it the experiences and observations of life, and thus weighing it with prudence and care give effect to its just preponderance.

"The testimony in the record, although circumstantial, proves the acts of adultery on defendant's part alleged in plaintiff's petition."

In Nelms v. Louisiana Railway & Navigation Company, 3 La.App. 428 (syllabus), we find:

"Courts are not authorized to disregard the positive testimony of witnesses who were in a position to have had knowledge of occurrence related, unless there is an inherent improbability in their statement, or their testimony conflicts with itself, or the facts related are in conflict with unquestioned physical facts in evidence, or unless the witness is impeached or his conduct on the trial is such as might warrant the court in disregarding his testimony."

See also Mender v. Brauch, 141 La. 940, 75 So. 1000; Schramm v. Toye Bros. Yellow Cab Co., La.App., 169 So. 116; and Succession of Seymour, 52 La.Ann. 120, 24 So. 818, 26 So. 783.

In the light of the foregoing authorities, we shall proceed to weigh and consider the evidence in this case:

The only witnesses who reflect upon the defendant is his wife and her mother, whose statements are largely predicated on her daughter's assertions. The plaintiff's father definitely stated that defendant was a good husband and father. No one questioned the excellent reputation and character of the defendant's mother and family. The evidence shows that they are substantial and respectable people.

According to the testimony of the plaintiff's witnesses, her father was unable to support his own family and his wife was compelled to take roomers and boarders and his daughters had to work as waitresses at very early ages. The record further shows that three of the daughters were married and that all three have separated from their husbands and are working as waitresses for small wages. While the members of the plaintiff's family state that they are willing to assist her in rearing the child, it is extremely doubtful, without the father's financial assistance, that they would be able to do so. It further appears that Mrs. Mouille is not particularly careful to see that her roomers and boarders are proper persons, for example, when the circumstances indicated that a man and woman, who lived in her house as man and wife, were not married, Mr. and Mrs. Mouille made no inquiry and stated that it was none of their business.

It is conceded that the cafe and bar of George Angelle is about five miles from the small village of Lauerville and fourteen miles from the City of New Iberia; that its patrons consist of the men who work on dredge boats in that vicinity and those who motor from Lauerville and New Iberia and other places. There is a coin electric orthrophonic which furnishes music for the patrons who wish to dance. The evidence is convincing that the waitresses drink and dance with the patrons. It is admitted that they serve men in the private dining rooms. It is noted that this is where plaintiff brought her daughter to live during the time she had the custody of the child and only returned her to New Orleans when the husband took a rule against her for that purpose.

Although the plaintiff alleged in her petition that the defendant and his mother cursed and abused her and ejected her from their home on March 15, 1937, in her testimony, she admits that, when her husband refused to let her have the child because of its illness and stated that she was not a fit mother to take care of it, she slapped him, and that his mother restrained him from retaliating. At no time did she testify that defendant's mother cursed, abused and ejected her from their home.

We can find no reason to reject the testimony of Bobbie Young and Mrs. T. M. Adams. They tell a straight forward story in an intelligent manner of what happened on March 15, 1937.

We are urged to disregard Mrs. Ida Christmas' testimony, which is very damaging, because she and the plaintiff had some dispute about a boundary fence. This witness is in a disinterested position and has no reason to harm or injure the plaintiff or to favor the defendant.

While the testimony of Mrs. Daniegh Latioleis might be said to be prejudiced on account of previous difficulty with the plaintiff, this cannot be said with reference to the statements of Mrs. Stella Cavaller, who stated that she appeared in the case in the interest of the child and not for the purpose of assisting the father.

There is an adage that "Heaven has no rage like love to hatred turned, Nor hell a fury like a woman scorned", yet, this

would not justify us in disregarding Mrs. Marie Angelle's testimony that the plaintiff broke up her home because of her improper relations with her husband. It will be remembered that the plaintiff was this woman's cousin and although she protested against her presence, her husband continued to employ her and she continued to remain at Lake Dautrieve. The fact that this witness admitted some interest in another man, after her separation from her husband, her testimony cannot be rejected, because her statements are corroborated in too many respects—for instance, Mrs. Angeline Geautreau, who stayed in the Schutten home on Maurepas Street and worked in the Lake Dautrieve cafe and restaurant with the plaintiff, would have no reason to misrepresent the situation and we are of the opinion that she acted with natural maternal instinct when she forbade her son to visit her at the Schutten residence for fear that he might get in trouble with Mr. Schutten on account of his attention to his wife.

The testimony of the plaintiff's witnesses as to the good reputation of Angelle's place of business at Lake Dautrieve is predicated on their observations at the time they visited there, but these visits were not frequent enough for them to be able to say that the place at all times was operated in a respectable and decent manner.

From a reading of the record, one is compelled to conclude that this estrangement and trouble arose because of the wife's disposition to rebel against reasonable restrictions and to select companions of her own choosing, contrary to her husband's advice and wishes. A married man has a legal right to object to his wife having friends in his home or elsewhere whose influence is of a degrading and corrupting nature. It is his duty to protect the sanctity of his home and to maintain the proper moral atmosphere in which his children will be reared. It is highly suspicious, to say the least, for a married woman to go automobile riding alone with a male companion or to entertain him alone in her home, particularly after her husband has forbidden her to do so. Such conduct is greatly provocative of serious trouble. There are too many witnesses who testify as to the plaintiff's misconduct for us to disregard their testimony on the ground that it was prejudiced, biased or untruthful.

Completely ignoring the testimony of Noah Gauthreaux, there is sufficient evidence in this record to prove that the defendant's complaints are well founded and that he is entitled to judgment.

It is, therefore, our conclusion that the trial judge committed error in disregarding all of the defendant's witnesses' testimony and accepting the testimony of the plaintiff and her witnesses.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court is annulled and set aside and it is now ordered, adjudged and decreed that there be judgment herein in favor of Reginald Schutten, defendant, and against his wife, Pearl Mouille Schutten, plaintiff, decreeing a separation, a mensa et thoro, and granting unto him the per-

manent care, custody and control of his minor daughter, Dorothy Schutten.

O'NIELL, Chief Justice (dissenting).

This case, on its merits, presents only questions of fact, which questions, in turn, depend upon the veracity of the witnesses, whose testimony is conflicting. In such a case an appellate court should defer very largely to the judgment of the judge before whom the witnesses testified.

Both parties to this suit are asking for a decree of separation from bed and board. The record leaves no doubt that such a decree ought to be rendered. It would not matter much whether the decree should be rendered in favor of the wife, or against her, but for the fact that the decree against her condemns her as being unfit for and unworthy of the possession or guardianship of her child. The only matter in contest in this case is whether the mother or the father should have the possession of their only child—a girl only ten years of age, and very weak physically. She needs a mother's care. The judge who tried the case had the child brought before him, and tenderly questioned her. The judge, therefore, got first-hand information as to where the child's happiness lay, before he decided to consign her to the care of her mother. We must bear in mind that, in a case like this, the judge retains jurisdiction and authority to transfer the care and guardianship of the child from one parent to the other, at any time, according to changing circumstances or conditions, even after the appellate court has passed upon the case. For that reason, also, this case is peculiarly one in which the judgment of the court in which the witnesses testified should not be set aside by an appellate court unless the judgment is obviously wrong.

The testimony is conflicting, of course, but it appears to me, as it appeared to the judge before whom the case was tried, that the preponderance of the evidence is in favor of Mrs. Schutten. The terrible arraignment of her, in her husband's pleadings, is not supported by proof—in my judgment—except perhaps as to some pardonable indiscretions on her part. Her reason for going to work in a restaurant was that her husband, according to his testimony, was working for a salary of only ten dollars a week; and she had to lend her help to the support of the little family until times might improve. The restaurant was patronized by a high class of people; and all of them who testified in this case said that the place was respectable and well conducted. According to their testimony, the private dining rooms where the waitresses were called upon sometimes to wait upon customers, had glass doors and windows on all sides, and were surrounded, outside of the building, by a veranda, from which anyone could see into the dining rooms. The testimony shows that there was nothing improper in that feature of the establishment.

I agree with the judge who tried this case that the evidence does not sustain Mr. Schutten's charge that his wife was guilty of adultery. There is no direct charge that she had sexual relations with Joe Jones. Mr. Schutten, in his testimony, said that there were only two occasions when he

found Joe Jones at his, Schutten's home. The first of these occasions was in January, 1933, and the second was in June, that year. Mr. Schutten testified that, on the first of these occasions, he came home about 12:30 a. m. and found Jones and Mrs. Schutten standing at the front door talking; and that he, Schutten, merely bade Jones good night and went to bed, leaving Jones and Mrs. Schutten in their conversation. Mr. Schutten testified that, on the other occasion when he found Jones at his, Schutten's, home, he came home at 3:30 a. m. and, finding the front screen door latched, he entered his house through a side entrance, and, in entering, he collided with Jones, coming out of the house. He asked Jones what he was doing there, and Jones, having a package in his hand, said that Mrs. Schutten's mother had sent him for the package. Schutten testified that he took the package from Jones and found that it contained only an empty whiskey bottle; and he testified: "It seemed strange that her mother should be sending him for empty whiskey bottles; then I hit him", and that he ran away. Schutten testified that he then asked Mrs. Schutten what she was doing, and that she said that they had been giving a party, and that Jones had remained to wash the glasses. That is Mr. Schutten's version of the relations between his wife and Jones; and, taken at its face value, it does not prove that Mrs. Schutten was guilty of the unpardonable sin. Mr. Schutten testified that, on occasions when he worked until nearly midnight, his wife remained at her mother's house until the time for his home-coming; and that, "on several occasions she got Joe Jones to drive

her home at 11 or 11:30 at night." There is testimony showing that on all of these occasions Mrs. Schutten was accompanied by her mother or some other member of the family.

The only direct charge of adultery, in Mr. Schutten's answer to this suit, is the allegation that Mrs. Schutten was having sexual intercourse with a man named Gauthreaux during a period of three or four years. This allegation is discredited by the fact that Mr. Schutten has never asked for a divorce on the ground of adultery; and it is not supported by any testimony except that of Gauthreaux himself. He testified, on the trial of the rule to show cause why Mrs. Schutten should not have the temporary care and custody of her child, that he had known the Schuttens for years, and that during those years he had gone on parties with Mrs. Schutten and got drunk with her, and had committed adultery with her. He said that his relations with her ended in 1932, and that he had never been with her since that year. He testified that he was only twenty-five years old when he was testifying, in 1937; hence he was only twenty years old in 1932. He said that he was married in 1933; and that he brought Joe Jones to the Schutten home and introduced him to Mrs. Schutten, because he, Gauthreaux, knew that he was about to be married. On cross-examination he admitted that he had not been summoned as a witness in the case, but said that he had come into court voluntarily, to divulge his past relations with Mrs. Schutten for the benefit of her child, and because he, Gauthreaux, then also had a little

daughter. We must bear in mind that Mr. and Mrs. Schutten's little daughter, for whose welfare Gauthreaux claimed to be so solicitous, was born on the 6th of February, 1928—before the time when Gauthreaux claims to have commenced his illicit relations with the child's mother.

On the trial of this case on its merits, Gauthreaux was called to the witness stand again by counsel for Mr. Schutten; but, when the first question was put to him, the judge asked if the purpose was to have the witness support the allegation that he had committed adultery with Mrs. Schutten, and, being informed that that was the purpose, the judge refused to hear the testimony. My opinion is that the judge was right in refusing to allow the witness again to flaunt his arrogance in the face of the court. Such testimony is, in its very nature, and from the source from which it comes, utterly unworthy of belief. There is no reason why a judge should be obliged to listen to testimony that cannot serve any purpose but to blast human lives and to degrade the one who proposes to do the blasting. Such testimony is not to be compared with that of paid detectives. The objection to the testimony of paid detectives is founded upon the fact that they are paid to procure and furnish the evidence. The objection to that kind of evidence applies also to the testimony of hired expert witnesses. But the testimony of one who claims, by his testifying, to be violating the most intimate of all secrets violates a principle of public policy. A woman is defenseless against such testimony. If she takes the witness stand and denies the accusation, she merely leaves it to the judge or jury to decide whether she or her accuser committed the perjury. If one who has been guilty of having illicit relations with a certain woman is summoned as a witness, against his will, and is asked whether he committed the offense, he ought to refuse to answer. A judge should not be allowed to punish him for contempt—and I doubt that any judge would punish such a witness for contempt—for refusing to be put on the spot, so to speak, by being compelled to elect whether he will debase or perjure himself. If such a witness does not refuse to divulge his secret, the judge ought to forbid him to divulge it. And the reason for that is that the testimony would be utterly worthless as evidence. It is a matter of no importance that there is no statute forbidding the giving or hearing of such testimony. We are admonished by the Civil Code, in article 21, that where there is no express law the judge must decide according to equity, and that to decide according to equity an appeal must be made to natural law and reason. Accordingly, there is no reason why a judge should listen to testimony that is essentially worthless as evidence, debasing of the one who gives it, hurtful to others, and repulsive to the human sense.

For these reasons I respectfully decline to subscribe to the prevailing opinion or the decree rendered in this case.