HIGGINS, Justice.
 

 The husband instituted proceedings against his wife for the custody of their three year old minor son on the ground that his wife was morally unfit to continue in the custody of the child, because of her adulterous relations with the plaintiff’s brother, particularly on April 13, 1938, at 1450 Josephine Street, City of New Orleans, about 10 o’clock p. m. He also prayed that he be relieved of the assessment of alimony for the support of his wife and minor son.
 

 The defendant denied the charges.
 

 There was judgment dismissing the rule and the plaintiff appealed.
 

 The record shows that .the couple was married in St. Bernard Parish on January 15, 1934, and that their son was born on February 6, 1936, in the City of New Orleans.
 

 The husband filed suit for a divorce against his wife on February 18, 1938, alleging that she committed adultery with
 
 *1005
 
 his brother, Joseph, on February 16, 1938, at 2044 Camp Street, New Orleans. He also asked for the custody of his minor son.
 

 The defendant denied any wrongdoing and, in reconvention, asked for a separation from bed and board because of cruel treatment by her husband, who publicly and without any reason therefor charged her with having committed adultery with his brother in their home on October 10, 1937 and February 16, 1938.
 

 On April 6, 1938, the trial court rendered judgment dismissing the plaintiff’s suit, and granting the defendant in reconvention a judgment of separation from' bed and board, the permanent care, custody and control of the child, and condemning the plaintiff to pay alimony at the rate of $9 per week for the support of his wife and $3.50 per week for the support of his son. The husband did not appeal from the judgment.
 

 The wife instituted contempt proceedings on June 14, 1938, against the husband for nonpayment of a part of the alimony for six consecutive weeks and upon the payment of the amount in arrears, the rule was dismissed by the trial judge.
 

 On July 1, 1938, the husband filed the rule upon which the controversy before this court is presented.
 

 We shall now narrate the testimony of the witnesses in the order in which they testified.
 

 Plaintiff stated that on • the night of April 13, 1938, after attending a picture show and while he was standing in front of De Rouen’s drugstore at Josephine and Magazine Streets, his wife in company with a young woman went into the drugstore and ordered a drink; that almost simultaneously his brother, Joseph, arrived at the drugstore and stood on the outside; that after obtaining the drink, his wife left the drugstore and walked down Magazine Street, and his brother, Joseph, followed her; that. he then walked up Magazine Street and when he reached Prytania Street and Jackson Avenue, he saw his wife and brother walking up St. Charles Avenue together; that he followed them, remaining a distance of about a block away, and that they went into Moffatt’s drugstore, located at the corner of St. Charles Avenue and Sixth Street; that he then followed them out Sixth Street, down Prytania Street until they entered the yard at 1450 Josephine Street, where his brother had a room in the rear of the premises on the first floor; that he waited awhile and then walked in the back entrance of the place on Prytania Street and quietly looked into the window of his brother’s room and saw the couple lie down on the bed together; that he then went to Jackson Avenue and Magazine Street, where he formerly spent some of his leisure time in the evening, to get a friend to go.back with him to his brother’s room to witness his wife’s misconduct; that two taxicab drivers, who were his acquaintances, agreed to accompany him and they got in one of the taxicabs and drove to his brother’s address; that they went through the back entrance on Prytania Street, on to the downstairs back porch; that he opened the screen door,
 
 *1007
 
 turned the knob of the main door and pushed it open and the. three of them walked in and found his brother and his wife in bed together, lying close to each other, and her clothes were above her knees; that after telling them he knew he would find the “two snakes in the grass together,” he and the witnesses walked out; and that they returned to the taxicab stand at Jackson Avenue and Magazine Street and after telephoning his lawyer, the three of them rode in the cab to the attorney’s house, where they related what they had seen. (This attorney is not the present counsel of record for the plaintiff.)
 

 The two taxicab drivers were Lewis Maurer and August Hagardorf, subpoenaed witnesses, both of whom work for the White Top Cab Company at their stand on Jackson Avenue and Magazine Street, a distance of about five blocks from 1450 Josephine .Street. Their testimony corroborates the plaintiff’s in all respects, except1 that part where the husband was alone when he first began to follow the couple.
 

 C. M. Johnson, a friend of the plaintiff and a former co-worker at the Service Foundry, and who now operates a retail grocery at 1819 Sophie Wright Place, testified that he had seen the defendant and Joseph Vice sitting on a bench in the Coliseum Park as late as 9 o’clock at night on three or four occasions; that he appeared in court as a witness for the plaintiff in rule on the Friday previous to the date on which he was giving his testimony and that on the Tuesday night thereafter the defendant called at his grocery store and told him not to come to court and testify against her as there would be “plenty of hell down there,” and if he did not wish to get in trouble, it would be best for him to stay away; that on Wednesday night, a week before giving .his testimony, he and the plaintiff were standing at the corner of 1055 Camp Street, near the witness’ home, and Joseph Vice passed; that he followed him out Orange Street, up Magazine Street and out Race Street to Constance Street to the 1500 block, where the .defendant lived; and that he saw Joseph Vice go into her home and later about 8:30 p. m., he came out with her little boy and went to a saloon on the corner of Orange and Constance Streets, where he got a bottle of beer.
 

 Joseph Vice, who was subpoenaed, testified that he is the brother of the plaintiff and admitted that he had been intimate with the defendant since November, 1937, and particularly on the night of April 13, 1938, at 1450 Josephine Street, about 10:30, when he and the defendant were surprised in his room by the plaintiff and the two witnesses; that he carnally knew her on July 13, 1938, or just two days before he testified; that the.defendant was in a delicate condition as the result of their illicit relations; that she asked him for money for the purpose of having an abortion performed; and that he practically lived with her since November 1, 1937, and they had misconducted themselves iñ the presence of the child.
 

 
 *1009
 
 Leo Vice, the father of the plaintiff and Joseph Vice, testified that he -lived with his wife, his daughter and his granddaughter at La Place, Louisiana; that he had a comfortable home and would welcome his son’s minor child in his home, where he could be properly reared; that when he came to New Orleans for treatment at the Touro Infirmary, he spent sometime at the residence of his son; that he observed the wife leaving about 8:30 in the morning and coming back about 3:30 in th'e afternoon on several occasions, during the time his son was at work; that at night she brought her girl friends to her house, some of’ whom were “pretty bad,” because on one occasion while he was lying on the bed, one of the girls said, “Old man, you are not very sick. It is a young girl like me you ought to have for a wife;” that one of the girls misbehaved herself (in a manner which is unnecessary for us to describe here); that his daughter-in-law was present when this happened; that the defendant visited his home in La Place and because she and his son, Joseph, misbehaved themselves while sitting together in a porch swing, he reproved his son about his conduct, telling him “Joseph, you ought to be ashamed the way you did out there;” and that Joseph became angry with his father, walked away, went into his room and lay on the bed and that a few minutes after-wards, the witness went to Joseph’s room and found him lying down and the defendant sitting on the bed beside him.
 

 J. O. Montagut testified that he occupied the position of Superintendent of Public Schools of St. John Parish and was acquainted with Leo Vice and his wife for twenty-five years and that their general reputation in the community was very good. The attorney for the defendant admitted that the plaintiff’s parents were fine people and capable of taking propei; care of the child.
 

 The only evidence offered in behalf of the defendant was her own testimony and she denied all of the witnesses’ testimony, except that of her father-in-law with reference to his reprimand of Joseph on the occasion of her visit at his home at La Place as a result of their misconduct in the porch swing. She states that her husband secured employment for his brother, Joseph, who came from his home at La Place to live with them at 2044 Camp Street and that on October 10, 1937, her husband struck her in the face and accused her of having illicit relations with his brother; that after their separation she, together with her mother, her uncle and her minor son, stayed at the residence of her grandmother, 1512 Constance Street, which is in a respectable neighborhood; that in the early part of May, 1938, on a Saturday evening about 6:30 p. m., while her husband was in arrears with the payment of alimony, he came to get the child, in accordance with the order of the court, to have him over the week-end, and that upon his promise to promptly pay the alimony and increase it, she yielded to his request and cohabited with him, although at that time there was a judgment of separation from bed and board between them and she had previously had him summoned before court in contempt proceedings for nonpayment of the alimony; and that she
 
 *1011
 
 was not certain that she was in a pregnant condition and, if so, it was the result of her relations with her husband. (Both counsel admit that a child was born to her on February 2, 1939.) She appealed to the judge not to take her three year old son away from her, as she loved him very dearly and had done what she could to properly protect and rear him, and although it might not have been the best, she was not “unworthy.”
 

 In rebuttal, the husband denied that he had had any relations with his wife after the judgment of separation from bed and board and both counsel admitted that within the thirty day period allowed by Article 191 of the R.C.C., the husband had filed a petition in the Civil District Court for the Parish of Orleans to disavow the paternity of the child and that the matter was pending there for trial.
 

 The only issue involved is one of fact dependent upon the veracity of the witnesses and as our learned brother below did not give any written reasons for his judgment, we do not .know upon what grounds he rejected the testimony of the plaintiff and his witnesses.
 

 Counsel for the defendant argues that the testimony of Joseph Vice should be entirely disregarded because any man, who would be so base as to publicly reveal his intimate relations with a woman, stultifies himself to such a degree that his evidence should be repudiated. Counsel for the defendant did not even cross-examine this witness and the trial judge recalled him to the stand and further interrogated him. In the case of Mouille v. Schutten, 190 La. 841, 183 So. 191, we pointed out that such testimony should be scrutinized and carefully weighed, but that it could not be disregarded where it,, was corroborated by other evidence.
 

 It is said that as the plaintiff was an interested and antagonistic party, little, if any, credence should be given to his statements, particularly as he confessed he obtained the evidence by sneaking upon his wife and her alleged co-respondent. The court should carefully analyze and weigh well such testimony, and again we say that neither spouses’ testimony can be arbitrarily cast aside.
 

 It is contended that the evidence given by the two taxicab drivers was unsatisfactory and unacceptable because no reliable and decent person would voluntarily go upon a mission to be an eye witness to such an affair. If every person took this view of these types of cases, the law would provide that adultery is a ground for a divorce and a cause for depriving the mother of the custody of her minor children, but it would be impossible to secure witnesses to prove the case. The testimony of witnesses in matters of this nature should be thoroughly considered and the court has no right to disregard such evidence without just reason. Of course, each case, to a great extent, depends largely upon its own facts.
 

 We are urged not to accept the plaintiff’s and his witnesses’ testimony and it is stated that the trial court was justified in disbelieving them, because of certain discrepancies in their statements. For instance, the plaintiff said that he
 
 *1013
 
 paid one of the taxicab drivers, August Hagardorf, the sum of $1.40 for both the trips to his brother’s house and to his attorney’s home. The chauffeurs stated that the sum of $1.05 was paid for both trips, 35 cents for the first one and 70 cents for the second. Plaintiff said there were glass panels in the door to his brother’s room, where the parties held the liaison, but the witness, Maurer, said there were wooden panels in the door. This witness also said that the parties went directly from Joseph Vice’s room to the plaintiff’s attorney’s home and - did not return to the taxicab stand at Jackson Avenue and Magazine Street before going there. The plaintiff and Hagardorf had previously testified that the plaintiff and the two witnesses returned to the taxicab stand and later went to the attorney’s home about 11 o’clock at night. These contradictions on immaterial points were not sufficient reasons to brand their testimony as untruthful. This is especially true in view of the fact that the testimony of Mr. Johnson and the plaintiff’s father tends to corroborate the testimony of the plaintiff and his witnesses, for it at least showed an attraction and an unusual interest between the defendant and Joseph Vice. It must be remembered that the wife did not contradict her father-in-law’s statement that he reprimanded his son, Joseph, for his improper attitude toward his brother’s wife.
 

 While it is true-that these witnesses testified to a sordid affair, that fact per se does not brand their statements as perjury. The unsupported and uncorroborated denial of the defendant of the charges of wrongdoing is insufficient to overcome the overwhelming preponderance of the evidence against her. The wife was in no better position than her husband for she, too, was an interested party and had as much reason to conceal the truth as he had reason to misrepresent it. No attempt was made to summon witnesses, whose testimony might tend to corroborate her statements nor was any request made for a continuance for the purpose of doing so, and even now we have not been requested to remand the case to give the defendant an opportunity to produce any such evidence.
 

 It is our opinion that the trial judge committed manifest error in disregarding the great preponderance of the evidence in favor of the plaintiff and dismissing his suit and that on the record as made up, plaintiff was entitled to a judgment as prayed for.
 

 For the reasons assigned, it is ordered, adjudged and decreed that the judgment, appealed from is annulled and set aside, and
 

 It is now ordered, adjudged and decreed that there be judgment in favor of Emile Lawrence Vice, plaintiff, and against Helen Hart Buisson Vice, defendant, granting him the custody, care and control of his minor son, Emile Lawrence Vice, Jr., and releasing and discharging him' from the payment of alimony for the support of his wife and minor son; plaintiff to pay all costs of court.
 

 FOURNET, J., absent.