ROGERS, Justice.
 

 Dr. John R. Fridge sued William D. Talbert and W. B. Sullivan and the minor son (name not stated) of Sullivan for damages in the-sum of $4,303.35.
 

 
 *940
 
 Plaintiff alleged that the defendants were solidarity liable to him in the amount claimed, because they negligently allowed a fire which they started on Talbert’s land to spread to plaintiff’s land and destroy a number of pine saplings, fruit and other trees, plants, vines, and shrubs.
 

 Defendants denied they started the fire or had any knowledge of its origin. They averred that when the defendants Talbert and Sullivan noticed the fire, which was some time after it had started, they went to the scene and attempted to extinguish the blaze, but were unable to do so.
 

 The court below rendered judgment in plaintiff’s favor against the defendants W. D. Talbert and W. B. Sullivan, in solido, for $1,750.50. From this judgment the parties cast have appealed. Plaintiff, answering the appeal, has asked that the judgment be increased to the amount for which he sued.
 

 On January 2S, 1921, E. M. Stafford, of New Orleans, purchased a large body of land known as the “Stevensdale Plantation” in the parish of East Baton Eouge. In June, 1929, Stafford sold to Dr. John E. Fridge for $437.-50 a small portion of land taken from the plantation. The portion of land sold to Dr. Fridge contains three and one-half acres and lies on the south bank of the Comite river. Subsequently, Stafford sold' the remainder of Stevensdale Plantation to W. D. Talbert, one of the defendants in this case.
 

 Dr. Fridge erected a small house or lodge and planted a number of trees and shrubs on his property, which is used solely for the recreation of himself, his family, and his friends.
 

 The portion of the Stevensdale Plantation which was purchased by W. D. Talbert is irregular in shape and is composed of approximately five hundred acres. The length of the property from north to south is about twice as great as its width from east to west. Its north half is bisected from. east to west by the line of the Baton Eouge, Hammond & Eastern Bailroad. Stevensdale lane, which runs through the center of the plantation, enters the property from the south, crosses the railroad track, and runs to the Comite river, which forms its northern boundary. The property of Dr. Fridge, which is at the northern terminus of Stevensdale lane, is bounded on three sides by the Stevensdale Plantation and on one side by the Comite river.
 

 The plantation house is situated about halfway down the tract a few feet west of1 Stevensdale lane. A small railroad station and a railroad storehouse are located near the track on the railroad right of way about one hundred feet east of the Stevensdale lane. At the point where the railroad track crosses the western boundary of the Talbert property there is another plantation or farm known as the Trahan property. This plantation or farm, which is situated immediately south of the railroad track, indents the western portion of the Talbert property.
 

 To the west of and adjoining the property of Dr. Fridge lies a dense growth of trees extending to the west and north for an undetermined distance. To the south and southwest of Dr. Fridge’s property lies an old field extending south to the railroad, north to the woods, and west to a large ravine, which is choked with trees and underbrush, running north from the railroad through the woods to the
 
 *942
 
 river. West of the ravine is another and larger field extending westward to the Trahan ¿property. During the early part of the year 1932, these fields as well as the land owned by Dr. Fridge were covered with a heavy growth ■of dry broom sage and grass.
 

 On February 8, 1932, a fire which started •shortly before midday in the broom sage and grass on the Talbert property, under the force of a high wind blowing from the southwest to the northeast, spread to the broom sage and grass on the Fridge property, with a resulting damage to a number of pine saplings, •camphor and other trees, bushes, and shrubs.
 

 At the time the fire occurred the defendant W. B. Sullivan resided rent free on the Talbert property, which, in return, he took care •of for the owner.
 

 Plaintiff alleged, and contends he proved, •that Talbert, the owner, and Sullivan, his ■caretaker, set fire to the dry broom sage and grass on Talbert’s land adjacent to plaintiff’s land in the face of the high wind that was blowing towards plaintiff’s land, 'and that as the result of this negligent act of the defend.ants, plaintiff’s property was damaged to the ■extent and in the amount set forth in his •petition.
 

 Defendants alleged, and contend they proved, that the fire started in the dry grass And broom sage on the western edge of the Stevensdale Plantation, north of the railroad track .and adjoining the Trahan property, a •distance of approximately half a mile from the Fridge property, between which and the place where the fire started is the deep and wooded ravine, which lies about six hundred yards west of plaintiff’s property. That they •were not near the spot where the fire started and had nothing whatever to do with its origin.
 

 The only witness offered by plaintiff in his attempt to establish the origin of the fire was S. L. Holden, who was employed by the railroad company to watch over certain bridge material contained in the small warehouse near the Stevensdale flag station.
 

 Mr. Holden testified that some time after dinner on the day of the fire he was in and about the warehouse, which is situated approximately one hundred feet east of Stevens-dale lane. That he saw an automobile come up the lane and stop near the railroad station. That as he walked towards the car he saw the defendants Talbert and Sullivan and Sullivan’s son get out of the car, cross the railroad track, and enter Talbert’s land. That they turned to the left going towards the Fridge property. “At about 150'or 200 yards they stooped down, and after they rose up and walked a little piece, smoke began to rise and I seen fire. They done that several times up to a little drain in there, and the young man, Mr. Sullivan’s son, come along and went in there and went where the fire was. and wrung off some of the broom sage, set it afire and strung it along.” The witness also testified that after the fire was started Talbert and the Sullivans reached the spot where some fence posts were stacked, and started to put out a little fire which was among the posts. That Sullivan’s son asked him for a bucket, and that he directed him to the cement house, where he got the bucket, and then he got some water and put out the fire. ■
 

 The defendants Talbert and Sullivan, testifying, in their own behalf, denied that they started the fire which damaged plaintiff’s
 
 *944
 
 property. Talbert testified that about noon of tbe day on wbieh the fire occurred, Sullivan, Sullivan’s son, who was a young man twenty-six years old, and not a minor as alleged by plaintiff, and be were at tbe plantation, or farm house occupied by tbe defendant Sullivan. This farm bouse is situated about thirty feet west of tbe Stevensdale lane and a mile south of tbe railroad crossing. One of Talbert’s farm bands, a negro boy named Sim Gray, bad been sent into tbe pasture north of tbe house to bring in some mules which were to be used for discing purposes that afternoon. Lew Bell, a negro farm band then in tbe employ of Mr. Will Sharp but later in the employ of Talbert, pa'ssed along Stevensdale lane and spoke to the Talbert party standing in front of tbe Sullivan bouse. Bell bad gone to Baton Rouge on tbe previous Saturday and had walked back eastward on the railroad tracks until be reached tbe Stevensdale flag station, where be turned south into Stevensdale lane on bis way home.
 

 Talbert further testified that about half past 12 o’clock the Sullivans and he noticed the smoke of a grass fire arising on the far side of the pasture, into which Sim Gray had gone to found up the mules, in the direction of the Trahan property. The fire was moving apparently to the northeast and in the direction of the Fridge property and the woods and field lying east of the ravine.
 

 During the preceding months the defendants had been engaged in cutting fence posts, and on the day of the fire there were approximately one thousand of these posts stacked in two piles. The larger pile was on the edge of the woods about six hundred yards northwest of Stevensdale station. The smaller pile was in the open field about one hundred yards north of the railroad track. The fence posts were in the path of the fire, and their loss was imminent unless something was done to protect them. With this in mind, Talbert and the Sullivans, father and son, got into Talbert’s automobile and drove up Stevensdale lane in the direction of the railroad station and the places where the fence posts were stacked. Shortly after they started they saw Sim Gray coming towards them along the pasture fence. He had seen the fire also and was coming back to notify his employer. The Talbert party stopped for a few moments and spoke to Gray. After leaving Gray at the pasture fence, the party proceeded to the railroad station, where they parked the ear alongside the road just south of the tracks. Talbert and his companions got out of the car, crossed the tracks, and entered the field. Turning to the left they moved westward along the fence until they reached the ravine with the purpose in view of crossing the ravine so that they might be able to see the location and extent of the fire.
 

 Talbert testified that it was not necessary for his party to cross the ravine, because when they reached the ravine they found the fire creeping through the underbrush. They then turned to the right and followed the ravine north to the woods, finding the same conditions existing all the way. The witness stated that from their preliminary survey his party realized the fire was too extensive for them to attempt to extinguish it, and they then directed their efforts to saving the fence posts. The larger pile of posts was stacked at the edge of the woods several hundred feet east of the ravine. Talbert and his companions moved back along the south side of the woods.
 
 *946
 
 noting that the fire was already burning the grass along the edge of the woods. They fought the fire at the spot where the posts were stacked by beating it out with branches and by burning a clear space around the stack. When their efforts proved successful, they moved to the other stack of posts which was lying in the open field just north of the railroad tracks. When they reached this stack, they discovered that some of the posts were already on fire, and they immediately went to work to save them. While they were thus engaged, Mr. Holden came up, and the defendant Sullivan asked him if he could lend them a bucket in which to carry water with which to extinguish the fire. Mr. Holden told them they could get a bucket at the cement house. The younger Sullivan went to the place indicated, got the bucket and some water, and put out the fire among the posts. Talbert and his companions used the same methods in saving this stack of posts as they used to save the other stack of posts, namely, by beating out the fire with branches and by burning a clear space around the stack. Shortly thereafter the fire burned past the posts, spread to the Fridge property, and burned itself out in plaintiff’s field of pine saplings.
 

 After beating out the remnants of the fire, Talbert and the Sullivans returned to the farm house, and Mr. Holden returned to his duties at the railroad station.
 

 The testimony of the defendant Talbert,' which we have hereinabove summarized, was confirmed in every particular by the defendant Sullivan. His statement as to the meeting near the pasture fence with the negro boy, Sim Gray, was corroborated also by Sim Gray. That witness testified that he was sent into the pasture to get some mules, and when he was about in the middle of the pasture he saw a large fire in the field north of the railroad track; that he turned back to notify Mr. Talbert; and that he met Talbert, Sullivan, and Sullivan’s boy as described by Tal.bert and Sullivan in their testimony. After meeting the Talbert party, the witness went back into the pasture to get the mules and go to work.
 

 The witness Lew Bell, to whom we have hereinbefore referred, testified that as he passed the Trahan place he noticed, a fire in the field just north of the railroad; that although the fire was a small one, it was burning freely and spreading towards the north and east. He testified that he saw two tramps come up the railroad embankment from the direction of the fire; that these tramps walked along the track and passed him, going in the direction of Baton Rouge. He also testified that he saw a white man with a gun on his shoulder in the field south of the railroad track. The white man in question was a Mr. Vieknair, a friend of the defendant Sullivan, who by Sullivan’s permission was hunting on the Stevensdale plantation.
 

 Vieknair, who was called as a witness on behalf of the defendants, testified that he was present at the time and place referred to, by the witness Lew Bell. That he saw the negro and the two tramps, and that he also saw the fire in the field north of the railroad track. Both these witnesses testified further that neither Talbert, Sullivan, nor Sullivan’s son, nor any employee of the defendants, was about or near the fire.
 

 
 *948
 
 The statement is made in plaintiffs brief that • the decision in plaintiff’s- favor can be sustained on no other theory than that the trial judge believed plaintiff’s witness Holden. This statement necessarily implies that the trial judge disbelieved the testimony of the' defendants and their witnesses. And plaintiff invokes the familiar rule that where the evidence is conflicting the findings of the trial court will not be disturbed on appeal.
 

 But the rule invoked applies only to those cases in which the appellate court is in doubt as to ■ the' correctness of the findings of the trial' court. Where no such doubt exists, and the findings are clearly erroneous, the duty rests upon the appellate court to set them aside.-
 

 The consideration of written testimony by an appellate court has some advantages over the hearing of oral testimony by the trial court. A written record furnishes the opportunity for a more mature consideration of the stories told by the witnesses, for detecting the inconsistencies in the statements of individual witnesses, and for sifting the conflicting statements of opposing witnesses.
 

 From our examination of the record, we find no warrant for disregarding the testimony of the defendants and their witnesses. The personal interest of defendants, the bias of their two negro employees, and the friendship of Yicknair for- Sullivan are not to be overlooked :in weighing their testimony. But the -testimony should not -be disbelieved on the mere assumption that the witnesses committed perjury. The presumption is that a witness .on ,oath testifies honestly until the contrary is shown. And deliberate perjury should not be imputed even to a biased witness, except it cannot be avoided, when he testifies to a matter of fact within his personal knowledge.
 

 The fact that a witness is wholly disinterested offers no security against mistake. A witness is often honestly mistaken when testifying to the existence or nonexistence Of a fact, and the courts must use their own reason and common sense in determining the probability or improbability of his statements.
 

 Where witnesses differ, the courts should reconcile, if possible, the apparent contradictions their testimony presents. If this cannot be done, then the probabilities or improbabilities of their respective statements must be considered in the light of their capacity, opportunity or incentive for observation, the amount of corroboration, if any, and the degree of proof required.
 

 The testimony of a witness which is corroborated by admitted or established facts must prevail necessarily over thát which is inconsistent with those facts.
 

 It is possible that Holden, plaintiff’s witness, was mistaken when he stated that he saw Talbert and Sullivan and the latter’s son, as soon as they got out of the automobile and entered Talbert’s land, start the fire which later damaged plaintiff’s property. 'On the other hand, it is not possible that Talbert and Sullivan were mistaken when they denied that statement. Their testimony in that' respect was either true or untrue.,
 

 The testimony of Talbert and Sullivan is in accord with the otherwise established -facts; hence, we are bound -to conclude that it is correct and that Holden’s testimony is erroneous.
 

 
 *950
 
 Holden admitted that when he reached the automobile, Talbert and his party were entering the field through a gap in the fence. He stated that he did not remain by the car, but walked on the railroad crossing to an old loading platform, which was about one hundred yards distant from the spot where the smaller stack of fence posts was situated. He also testified that after Talbert and his party got out of the car they went towards the ravine and disappeared in the direction of the woods. Holden did not follow the party; hence it is clear, as he admitted, that he knew nothing of the larger stack of fence posts lying in the field at the edge of the woods, the fire in the field on the west side of the ravine, and defendants’ efforts to protect the posts from the fire. The witness testified he came up with defendants when they were fighting the fire at the smaller and nearer stack of fence posts. The testimony on behalf of defendants, which we think is correct, shows that this occurred about twenty-five or thirty minutes after Talbert and his party came upon the scene; after they had left the stack in the woods and moved over to the. stack in the field. It was at this time the defendant, Sullivan asked the witness for a bucket. It was about this time also that Holden saw Talbert and Sullivan stoop down and cause smoke to arise, in their efforts to beat out the fire, and young Sullivan wring off a wisp of broom straw, touch it to the blaze, and string fire along in an attempt to start a backfire against the main fire in order to protect the fence posts.
 

 Plaintiff contends that Holden’s testimony was corroborated by the testimony of plaintiff himself, to the effect that at 12:30 o’clock there was no fire burning on Talbert’s land and that Talbert and Sullivan' were not. at the latter’s house. The witness fixes' the time because> his office hours begin at 1. o’clock p. m. He testified that he was at the lodge on the day of the fire; that it was about a 25-minute drive from his lodge to his office; that there was no fire burning when he left the scene; and that he passed Sullivan’s house and did not see Talbert or Sullivan.
 

 Plaintiff’s testimony is purely negative. It is possible that plaintiff may have left his lodge earlier than usual on the day the fire occurred. And the fact he failed to observe any fire and failed to see Talbert and Sullivan is not convincing that no fire was burning on the western edge of the Talbert property and that Talbert and Sullivan were not at Sullivan’s home. Affirmative evidence in the record, which is supported by corroborating circumstances, establishes the contrary.
 

 Plaintiff contends that defendants, following their usual practice, set fire to the broom sage and grass on Talbert’s land in prepara-' tion for their spring plowing. The contention is not supported by the record. There is no testimony whatever that defendants indulged in any such practice. There is some testimony relative to other fires occurring ifrom time to time, but without any responsibility therefor attaching to-defendants:
 

 On behalf of defendants, five witnesses testified positively that'the fire originated in the grass and broom'sage on the western edge of the Stevensdale plantation just north of the 'railroad track and adjoining the Trahan property. There can be no doubt that the fire appeared on that portion of Talbert’s property which lies west of the ravine, because, admittedly, the broom sage and grass from the entire field was burned off.
 

 
 *952
 
 These witnesses also testified positively that defendants had no connection whatever with the origin of the fire, the cause for which is not shown in the record. The fire may have been due to a spark from a passing locomotive, a lighted match carelessly thrown away by a passer-by, a tramp’s camp fire, a hunter’s fire to clear the field and drive out the game, or some other cause.
 

 It is inconceivable that defendants started a fire in the field lying east of the ravine, as suggested by plaintiff’s witness Holden. Defendants’ fence posts were stacked in that field and were directly in the path of any fire that might be started there. It was apparent that such a fire driven by the high wind which was blowing at the time would necessarily endanger the posts. The testimony shows that the posts were valuable, and it would have been highly imprudent for defendants to expose them to destruction by igniting a fire at the spot indicated by plaintiff’s witness. The promptings of self-interest, if nothing else, would have restrained defendants from committing such a hazardous act.
 

 Another fact which tends to support the story told by defendants’ witnesses and to discredit the story told by plaintiff’s single witness is the location and extent of the burned area. It is not disputed that the fire ranged over the larger field lying west of the ravine as well as over the smaller field lying east of the ravine. This could not have occurred if the fire had originated in the smaller field adjoining plaintiff’s property. If the fire had been ignited at the point where plaintiff’s witness says it was ignited, the strong southwest wind blowing at the time would have driven the fire before it from the point of origin over the portion of the smaller field lying in front of it and onto plaintiff's property. The greater portion of the smaller field lying behind the spot where the plaintiff claims it originated as well as the larger field lying west of the ravine would have remained untouched by the blaze. The story told by defendants’ witnesses offers the only plausible explanation as to the place where the fire actually originated, namely, on or near the western edge of the Talbert property north of the railroad track and adjoining the Trahan property. Only a fire starting at that spot and driven toward the northeast by the strong southwest wind which prevailed could have burned over both fields owned by Talbert as well as over the tract owned by plaintiff.
 

 With due regard to the opinion of the trial judge, for which we have the highest respect, we think his judgment in this case is erroneous. The burden is on plaintiff to make out his case with reasonable certainty. This, in our opinion, he has signally failed to do.
 

 Eor the reásons assigned, the judgment appealed from is annulled and plaintiff’s demand is rejected, at his costs.