**187 So. 73**

**FOGLEMAN v. INTERURBAN TRANSP. CO., Inc.**

**No. 35052.**

Feb. 6, 1939.

Rehearing Denied March 6, 1939.

Julius T. Long, of Shreveport, for plaintiff.

Hawthorn, Stafford & Pitts, of Alexandria, for defendant.

FOURNET, Justice.

This is an action to recover damages from the defendant, Interurban Transportation Company, Inc., in the sum of $30,000 for personal injuries and resulting physical disability sustained by the plaintiff, Mrs. Ethel Burroughs Fogleman, when a large passenger bus, owned and operated by the defendant company, in an attempt to pass the Plymouth coupe in which plaintiff was riding as a guest collided with the coupe, and also to recover the further sum of $575 for medical and hospital expenses incurred as a result of said injury.

Defendant, in its answer, admitted the collision and the plaintiff's injury, but denied liability therefor or that the driver of the bus was guilty of any negligence in the operation of its bus and specially set out in detail the manner in which the accident happened.

The case was tried on the issues as thus made up, and the trial judge, in a well considered opinion, concluded " * * * that the bus driver, thinking he had safely passed the automobile in which plaintiff was riding, turned back too quickly across the road in order to get back on the right * * * and in doing so struck plaintiff's car * * *," and for the resulting injuries to plaintiff awarded her damages in the sum of $4,700.

The defendant appealed from the judgment of the lower court and the plaintiff, answering the appeal, asked that the judgment be increased to $6,800.

The Court of Appeal for the First Circuit annulled the judgment and dismissed plaintiff's suit (182 So. 335), whereupon she applied to this court for a writ of certiorari to review the adverse judgment, alleging that the Court of Appeal had ignored pertinent statutory law regulating

traffic on public highways and had misapplied the law of negligence in arriving at its conclusion, and had also, without reason, disregarded her testimony and that of her witnesses when it was corroborated in many respects by the defendant's own evidence. We granted the writ and the case is now before us for consideration.

The undisputed facts of the case are that on May 27, 1937 plaintiff was traveling as a guest in a Plymouth coupe driven by Miss Edith Durbin and owned by Mr. James Ipes, who was sitting between the two, in a northerly direction along Highway No. 165, between the city of Lake Charles and the city of Alexandria, at a point about seven miles from the city of Oakdale, when one of defendant's regular passenger buses, traveling in the same direction, in an attempt to pass the coupe, collided with the same, causing it to leave the concrete portion of the highway and to strike a stump in the ditch, throwing plaintiff out of the car and overturning on her, and as a result of which she suffered injuries, enumerated in her petition as consisting of a crushed chest, the fracture of eleven ribs, a mangled wrist and ankle, severe lacerations, general contusions, and brush burns over the remainder of the body, causing excruciating pain and disabling her so that she is unable to do any work to support herself and her two minor dependent children.

The record further shows that the accident occurred at about 5 o'clock in the afternoon on a bright day and that the road, at that point, is level, straight, and unobstructed.

It is plaintiff's contention that the bus driver attempted to pass the coupe at an excessive rate of speed, without giving timely warning of its approach, and without taking proper precaution to safely pass or to avoid coming into collision with the coupe.

On the other hand we have the defendant's version of the accident which, in its answer, is stated to be that the proximate cause of the accident was the negligence or carelessness of the driver of the coupe in which plaintiff was a guest in that after the driver of the bus blew his horn, indicating his intention to pass the coupe, the driver of the coupe turned too far to the right of the road, causing the coupe to leave the concrete slightly and that in an effort to right the car swerved too far to the left, striking the defendant's bus on its right side and causing the car to leave the highway and to eventually overturn several times.

At the time of the occurrence of the accident in the instant case, the law governing the use of the public roads, highways, and bridges of this state was embraced in Act 21 of the Legislature of the State of Louisiana for the year 1932, in which we find, under the general title Rules of the Road, the following:

Rule 4(c)3 (Rate and Speed of Certain Vehicles):

"It shall be unlawful to operate any motor vehicle engaged in this State in the business of transporting passengers for compensation, charge or hire, on any public road, highway or bridge, between cities,

towns and villages at a rate of speed in excess of *forty-five (45) miles per hour.*"

Rule 7 (Overtaking Motor Vehicle):

"(a) The driver of any vehicle overtaking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle.

"(b) The driver of an overtaking· vehicle shall give audible and sufficient warning of his intentions before overtaking, passing or attempting to pass a vehicle proceeding in the same direction.

"(c) The driver of a vehicle shall not drive to the left side of the center line of the highway in overtaking and passing another vehicle traveling in the same direction, unless such left side is clearly visible and free from oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be made in perfect safety; provided, that whenever an accident occurs under such circumstances, the responsibility therefor shall rest prima facie upon the driver of the vehicle doing the overtaking or passing.

\*    \*    \*    \*    \*    \*

"(f) The driver of a vehicle upon the public roads, highways or bridges of this State, who has been given adequate warning by an overtaking and passing vehicle, approaching from the rear shall promptly give way to his right in favor of such overtaking. and passing vehicle, and shall not increase the speed of his vehicle until it has completely overtaken and passed by the overtaking and passing vehicle; provided, however, that nothing herein shall mitigate against the provisions for prima facie responsibility provided for in this rule." (Italics ours.)

These provisions are identical with those found in Act No. 286 of 1938, which expressly repealed Act 21 of 1932, with the exception that the rate of·speed provided for in Rule 4(c)3 of Act 21 of 1932 was increased from 45 miles an hour to 50 miles an hour.

As stated by Babbitt in his work entitled Motor Vehicle Law: "Every experienced driver knows of the dangers involved in passing another vehicle going in the same direction, especially in the usual case where the leading vehicle is not at the extreme right of the road. \* \* \* The driver should wait till he sees a clear, straight piece of road ahead, blow his horn to warn the other vehicle, and pass ahead, taking care not to crowd the other vehicle as he turns back to the right of the road. He must in all cases use proper judgment and care and is liable for any negligence causing injury, especially if he runs into the other vehicle from behind. [Section 614.] *It is negligence, and sometimes wanton or gross negligence, for a driver, in overtaking and passing another vehicle, to cut in close to the front of the latter."* [Section 616.] (Italics and brackets ours.)

The author states further that: "As a general rule, the driver of an automobile owes the driver of a car in his rear no duty except to use the road in the usual

way, and may assume that there is no other automobile in the rear, or that such automobile will not interfere with his free use of the road. The leading car has the superior right on the highway, although the driver thereof is always bound to exercise ordinary care, and under some circumstances he may be required to slow down, or stop, or refrain from increasing his speed, in order to let the following car pass. But he is not liable for not hearing the horn, where in fact he has not heard it." (Section 621.) See, also, 29 Corpus Juris 654, 655; Hackett v. Alamito Sanitary Dairy Co., 90 Neb. 200, 133 N.W. 227, 41 L.R.A., N.S., 340, 341, Ann.Cas.1913A, 829; Huddy's Cyclopedia of Automobile Law, Volumes 3 and 4, 9th ed., Sections 121, 128; 2 Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, § 931; and Loprestie v. Roy Motors, Inc., 191 La. 239, 185 So. 11.

In the instant case, according to the testimony of the plaintiff and the two other occupants of the coupe, Miss Durbin and Mr. Ipes, at the time of the accident, the coupe was being operated in a careful and prudent manner at a rate of between 30 and 40 miles an hour. They further stated that if any warning was given by the defendant bus of its attempt to pass, they did not hear it, the approach of the bus being first discovered by plaintiff, who immediately called it to the attention of the driver. The driver of the coupe promptly moved to the right side of the road to clear the way to the left for the overtaking and passing bus, and almost immediately thereafter the bus, which was then being driven at a very rapid and excessive rate of speed estimated to be between 55 and 60 miles per hour, struck the coupe, causing it to immediately leave the pavement, turn over several times, and eventually land in the ditch.

The testimony of Homer Perkins, who, at the time of the accident, was driving a log truck to Oakdale along the highway, directly behind the bus and the coupe, fully corroborates plaintiff's version of the accident as above stated. He said that it appeared to him the bus, in attempting to pass the coupe, cut back too quickly to the right side of the road and struck the coupe.

The Court of Appeal gave no credence to the testimony of the three occupants of the coupe, assigning as its reasons therefor that it was "far from being satisfactory," and, speaking of plaintiff's testimony, said that it was "very indefinite and evasive," and, further, that it was in "apparent conflict" with the testimony given by Mr. Ipes and Miss Durbin. On the other hand, the court expressed the opinion that the testimony of defendant's witnesses was "fair and unprejudiced in any degree," and stated further that *"Taking it at its full value,* we can not but feel that it gives weight to the defendant's contention as to how the accident happened and certainly it tends to disprove the plaintiff's theory." (Italics ours.) [182 So. 338.]

A review of the testimony reveals that only one of defendant's witnesses supports defendant's version of the accident as stated in its answer, that of Mrs. Mimms, a farmer's wife and passenger on the bus, who, after stating that she was seated in

the first seat on the right side, described the accident as follows: "When he [bus driver] started to pass the car [coupe] was on the right side of the black line, the car then pulled out on to the shoulder slightly and then cut back on to the road, and at that time pulled too far in and hit the bus." (Brackets ours.) Frank Casteix, who occupied the second seat behind the driver on the left side of the bus, testified that at the time of the accident the bus was traveling at a rate of about 40 miles per hour, that the bus had completely passed the coupe, which, according to the testimony of *all* of the witnesses was traveling between 30 and 40 miles per hour, when *seemingly* the driver of the coupe, in attempting to overtake and pass the bus again, hit the bus. J. A. McKenzie, the driver of the bus, in a measure corroborating the testimony of Casteix, gave his version of the accident as follows: "After I had blown my horn about three times I started by, but I would say my bus was half way past the car, I had already picked up speed, *because when you pull to the right that is the only thing to do*. I picked up speed and blew again and they pulled over a little further to the right. I went ahead to the left hand side of the road just as close as I could get to the side of the road, and I was past the car and *seemingly* they caught up with me and hit me just a little past the center of the bus. *They crossed the black line and hit the bus.*" (Italics ours.) Another passenger, Mrs. Cecilia Dufour, an employee of the Fire Adjustment Bureau of Lake Charles, who sat in the third seat on the right side of the bus, in answer to the question whether the bus sounded its horn before attempting to pass the coupe, said: "Yes. * * * The bus driver blew his horn and I looked ahead and the bus began to pass and it seemed like we were going to be safe, and I looked to the side," and in answer to the question "And then what happened?" stated further: "My eyes fell to the side again and I noticed the top of the car a little and then I heard this scraping to the side of the bus and I looked quickly to the side and the car ran off to the shoulder of the road wobbly like like no one had any control over it and it sort of turned around facing the pavement and turned over three times. On the first time I saw Mrs. Fogleman [plaintiff] go out of the window head first and the car turned over on her." (Brackets ours.) In describing the blow caused by the collision, Mrs. Dufour stated it was "Just a *scrape* on the side of the bus. * * * It didn't move the bus at all." (Italics ours.) Another passenger, Mrs. Reiszner, who stated she was sitting behind the driver on the left side, in describing the accident, said: "Well when the bus went around the car it passed it, I believe, *I hadn't noticed whether it was all the way past it,* and I was sitting over looking out the window opposite the bus driver and I was noticing how far to the side of the road the bus has to go to be able to pass a car, and just about the time the bus had gotten, I don't know how far, from the car, *I heard this screeching sound and I turned around and the car was turning over.*" (Italics ours.)

Thus it may be seen that the testimony of these several witnesses offered by the defendant to overcome the theory of the accident as testified to by plaintiff's witnesses, is not only in conflict with that given by Mrs. Mimms, but, with the exception of the testimony of Casteix and the bus driver, conflicts one with the other.

This court said in the case of Fridge v. Talbert, et al., 180 La. 937, 158 So. 209, 212, that *"Where witnesses differ, the court should reconcile, if possible, the apparent contradictions their testimony presents. If this cannot be done, then the probabilities or improbabilities of their respective statements must be considered in the light of their capacity, opportunity or incentive for observation, the amount of corroboration, if any, and the degree of proof required,"* and in the case of Miller v. Hartford Live Stock Ins. Co., 165 La. 777, 784, 116 So. 182, 185, "Courts are slow * * * to impute perjury to an apparently credible witness. They prefer to accept his testimony as true, rather than the testimony of opposing witnesses, who may have erred in their recollections." In the case of Fridge v. Talbert, supra, this court further said *"The testimony of a witness which is corroborated by admitted or established facts must prevail necessarily over that which is inconsistent with those facts."* (Italics ours.)

The foregoing are well recognized rules of law applicable to all cases requiring an analysis of conflicting testimony which, when applied in this case, conclusively show that the version of the accident, as given by plaintiff's witnesses, is, as found by the trial judge, "clear, logical, and worthy of belief," and, in our opinion, is corroborated by the physical facts, and, in all material aspects, by each of the several witnesses of defendant who were present at the scene of the accident. That portion of their testimony that appears to be irreconcilable is of little, if any, probative value when considered in the light of the capacity, opportunity, and incentive for observation of each of these witnesses.

The driver of the coupe, Miss Durbin, stated that upon being apprised by the plaintiff of the approach of the bus, she immediately moved to the right of the road. That she did just that is testified to by *all* of the witnesses who saw the accident, those of the defendant as well as those of the plaintiff. She then testified that the coupe was struck by the bus almost immediately thereafter. This is in complete accord with the testimony of the other two occupants of the coupe and in harmony with the testimony of the driver and passengers of the bus, as may be seen from the following excerpts:

From the testimony of Mrs. Reiszner: "* * * just about the time the bus had gotten, I don't know how far, from the car, I heard this screeching sound and I turned around and the car was turning over."

From the testimony of Mrs. Dufour: "The bus driver blew his horn and I looked ahead and the bus began to pass and it seemed like we were going to be safe, and I looked to the side * * * and I noticed the top of the car a little and then I heard *this scraping to the side of the bus*

* * * the car ran off to the shoulder of the road * * * and it sort of turned around facing the pavement and turned over three times." (Italics ours.)

From the testimony of Mrs. Mimms, in answer to the question "What happened to the coupe after it hit the bus?": "The impact seemed to throw it off the road and it turned over several times."

The testimony of Casteix is to the effect. that it *seemed* as though the bus had completely passed the coupe and that 'it (the coupe) speeded up in an attempt to pass the bus again and hit it. We think the following excerpt from his testimony shows that what really directed his attention to the accident was when he " * * heard a screeching on the side of the bus * * *" and he then " * * * looked back to where the noise came from and saw the coupe turned over."

McKenzie's version of the accident is in accord with that given by Casteix, but when asked whether or not he could tell what happened after he felt the impact of the collision, he stated: "I could not * * * I heard the *screeching* of the tires and I saw the dust settle." (Italics ours.)

Thus it may be seen that in all material aspects the apparent conflicts and contradictions between the testimony of plaintiff's and defendant's witnesses are reconcilable and completely support the testimony of Homer Perkins, who the Court of Appeal refused to believe, although they stated that his testimony "Is the only direct evidence in the record tending to bear out the plaintiff's contention as to the actual manner in which the accident took place * * *," being of the opinion that " * * * his actions were not those of the normal individual who finds himself in the midst of such a scene * * *."

Referring to Perkins' testimony, we find that, after stating the manner in which the accident occurred, he further testified that he brought his truck to a stop at a point past where the bus had stopped and walked toward the place where the injured persons were, accompanied by the man who was with him by the name of John Carpenter, but that when he saw the injured were being placed on the bus and taken care of, he, being in a hurry to get to Oakdale in time to collect money due him for hauling, as it was near closing time and otherwise he would have to wait until the next pay day, rushed back to his truck and on to town. We find nothing in his actions that can be said to be unreasonable or incredible. The mere fact that he was not noticed by the witnesses for the defendant does not mean that he was not there. That might be explained by the fact that their attention was focused on the injured parties. No motive was assigned for his giving false testimony in this case. It could have been easily ascertained whether or not he was on the road at about that time by merely checking his statements. Then, too, he stated that he was accompanied at the time by a man named John Carpenter, for whose appearance as a witness plaintiff had issued a summons. On application for rehearing in the Court of Appeal, it was shown that the witness John Carpenter

was accessible and according to his affidavit attached to plaintiff's application for rehearing, if called upon and present, his testimony would be identical to that offered by the witness Perkins. We think that if the Court of Appeal was in doubt as to whether or not the witness Perkins was actually present at the scene of the accident as he testified, in the interest of justice, a rehearing should have been granted and the case remanded to the lower court to establish the true situation. Paul Klopstock & Co. v. United Fruit Co., 171 La. 296, 131 So. 25; Gleason & McManus v. Sheriff, 20 La.Ann. 266; State ex rel. Nelson v. Police Jury, 32 La.Ann. 884; State ex rel. Ranger v. City of New Orleans, 34 La.Ann. 202; Code of Practice, Article 906; Wicker v. Metropolitan Life Insurance Co., La.App., 172 So. 879; Gerth's Realty Experts v. Kracke, 156 La. 36, 100 So. 41; Parker v. Ricks, 114 La. 942, 38 So. 687; Hill, McLean & Co. v. Miller, 7 La.Ann. 621; Succession of Robinson, 186 La. 389, 172 So. 429; A. & J. Inc. v. Southern Cities Distributing Co., 173 La. 1051, 139 So. 477.

But according to the facts as we find them to be, it is unnecessary to remand the case. Our views are fortified by the physical facts, for it is shown that Miss Durbin, who was recalled to the witness stand after much testimony had been adduced by the defendant to show that there were skid marks caused by the coupe at the point where the accident took place and which were described by the witnesses as running in a northerly direction beginning at a point on the left side of the center black line of the road and extending from there to a point across the black line where the coupe made a sudden turn to the right, stated that when her attention was called to the approaching bus she immediately " * * * applied my [the] brakes and pulled over to the right." (Brackets ours.) These black marks, left by the imprint of burnt rubber from the tires on the wheels of the coupe, which, as found by the trial judge and by the Court of Appeal, could only have resulted from the application of the brakes, speak for themselves, and, in our opinion, are not only direct corroboration of Miss Durbin's statement of the facts in the case, but are a complete refutation of the theory of the accident as advanced by the defendant. It would have been a physical impossibility for the coupe, after having gotten off the pavement to the right side and cut back to the left, striking the bus on its right side near the center, to have reached a point on the left hand side of the black center line of the road and gained such a position as to leave the skid marks described by the several witnesses.

It is our conclusion that the overwhelming preponderance of the evidence shows that the proximate cause of the accident and the resulting injuries was the careless and negligent manner in which defendant's driver passed the coupe in which the plaintiff was a guest and the defendant is, therefore, liable for the damages suffered by her as a result thereof.

We now pass to plaintiff's claim to have the amount of the judgment increased from $4,700 to $6,800, as prayed for in her answer to the appeal.

The trial judge, in his written reasons for judgment stated: "It is conclusively shown that plaintiff suffered a lacerated lip, which had a one inch laceration through the lip requiring three sutures, and which healed but left a permanent scar. The right side of the chest was caved in and the left side pushed out by a crushing injury which fractured the second, third, fourth, fifth, and sixth ribs on the right hand side of the chest, and the second, third, fourth, fifth, sixth, and seventh ribs on the left hand side. There was also a fracture of the collar bone in the middle and the fragments were misplaced. There was a fracture of the left wrist, known as a colles fracture, which involves the ends of the radius, and a compound dislocation of the right ankle without a fracture, but with the end of the fibula protruding through a laceration in the leg, and the ligaments, muscles and blood vessels of the ankle and leg being torn. The plaintiff was in the hospital a month and four days, and of course the·fractured bones were placed in plaster casts and treated. The plaintiff suffered excruciating pain *and still suffers excruciating pain,* however her physician testifies that she will recover with practically no permanent injury except a deformity on the clavicle or collar bone, and the permanent scar on the lip," and allowed "For the pain and physical suffering which plaintiff has undergone and the injuries * * * $3,500.00. For the scar and permanent deformity of the collar bone * * * $1,000.00," and for medical fees, $200. (Italics ours.)

The only testimony in the record in support of plaintiff's claim for medical expenses was given by Dr. Heath, who stated that the bill had been rendered both to the plaintiff and to.the defendant bus company, but that though he did not remember the exact amount it was in excess of $300. The judge allowed only $200 without explanation.

■ The testimony is convincing that there is no reasonable certainty as to how soon plaintiff will recover from her injuries, many of which are very serious and, as a result of which, she was still suffering excruciating pain on the day of the trial of the case. The fact that plaintiff relies on her manual labor for her support and that of·her two children, convinces us that the award of the trial judge was not sufficient compensatory damages, particularly when we consider that she was about 33 years of age at the time of the trial, that she has no feeling in her lips, ankle, or feet, and that she still suffers from severe pains in her chest and back, and that it will be difficult to state how soon she will recover sufficiently to undertake a resumption of her physical task as wash woman from which she earned an average of $40 per month. We therefore conclude that under the facts and circumstances of this case plaintiff is clearly entitled to the amount asked by her in answer to the appeal.

For the reasons assigned, the judgment of the Court of Appeal is annulled, and that of the trial judge is amended by increasing the amount of the award to the plaintiff from $4,700 to $6,800, and, as thus

amended, the judgment of the lower court is affirmed; all costs to be paid by the defendant.

ODOM, Justice (dissenting).

I respectfully dissent from the majority opinion. As the trial judge stated in his written opinion, and as shown by the majority opinion of this court, there is no question of law involved. Only facts are involved, and in my opinion the testimony shows, if it does not demonstrate, that the defendant is not liable. I have read and reread the testimony and have given to it as careful consideration as it is possible for me to give to any record, and I am firmly convinced that the majority opinion fails to give that credit to the testimony of defendant's witnesses to which it is entitled. It fails also to recognize the weakness and uncertainty of the testimony of plaintiff's witnesses. The following undisputed facts, I think, show conclusively that the majority opinion is incorrect.

The trial judge said in his written opinion:

"There is only one question in this case, and it is purely and simply a question of fact. The question to be determined by the Court is whether the bus, in passing the car in which plaintiff was riding, cut over too quickly toward the right and thereby struck the car, causing it to be wrecked and plaintiff injured, or whether the car in which plaintiff was riding swerved to the left across the center of the road and struck the bus as it was passing, thereby causing the wreck and causing plaintiff to be injured."

That is a correct statement of the issue involved. If the driver of the coupe in which plaintiff was riding kept it on its right-hand side of the road and if the driver of the bus in passing the car cut too quickly to the right causing the bus to strike the front end of the car, then the driver of the bus was negligent and the defendant is liable. This, as the trial judge said, is a question of fact.

Plaintiff does not allege that the car in which she was riding was struck at or near the rear end by the bus. She alleged that the bus "struck and touched the left side of the front" of the car.

She further alleged that the paved part of the highway was 18 feet wide and that the car in which she was riding "was being operated well on its half and side of the said paved portion of the highway at the time said motor bus and coach approached and struck the said automobile".

If, as alleged, the car in which plaintiff was riding was being operated "well on its half and side of the paved portion" of the road at the time the bus "approached and struck" the car, the driver of the car was not at fault.

There were three persons in the coupe— Miss Durbin, the driver; Mrs. Fogleman, the plaintiff, and Mr. Ipes, the owner of the coupe. Each of these testified positively that the coupe was at all times well over on its right-hand side of the pavement. Miss Durbin was questioned particularly as to whether she got off her right side and said she did not.

Mrs. Fogleman, the plaintiff, said she was riding on the right-hand side of the coupe and saw the bus before it overtook the car. She was asked how long before and said, "We were on the right side of the road and I happened to look back and made the remark there is the bus."

On being questioned further, she said Miss Durbin was driving on the "right side of the black line". She was asked what part of the coupe was struck by the bus and said, "The left hand side, we was over on the right hand side of the road."

Mr. Ipes, the other passenger, was asked whether he knew what position the coupe occupied on the road and said, "It was on the right hand side of the road."

The testimony of the occupants of the car is in exact accord with the allegations of the petition that the car, when approached and struck by the bus, was well over on its half and side of the paved portion of the road. This they definitely recalled.

But, as relates to what the trial judge thought was the pivotal point in the case— and I agree with him on that point, which is whether the bus, in passing the car, cut over too quickly to the right and thereby struck it—, the occupants of the car, while being examined by counsel, gave no testimony whatever. Not one of them said that the bus cut over to the right too quickly. All they remembered was that the car was over on its right-hand side of the pavement and that the bus struck it, causing it to leave the road and turn over several times.

After each of them had been examined and cross-examined, the trial judge, who seems to have realized that they had given no testimony touching what he considered the crucial point in the case, asked Mr. Ipes, who was the last of the three to take the stand:

"How do you explain the fact that if you were on your side of the road and the bus was going around you how did the bus hit the front end of your car?"

His answer was, "He cut back too quick, is all I know."

What Mr. Ipes had previously said about what he knew of the accident indicates that his reply to the judge's question was an afterthought. Counsel for plaintiff asked him, "State what you saw of the bus before and at the time of the accident." He answered, "Mrs. Fogleman said there is the bus, I looked up and could see the passengers in the bus, and they hit me and I don't know anything more about it."

On cross-examination he was asked, "Where was the bus, on the side of your car?", and he said, "Right by the car, I could see the side of the bus, the passengers, then it hit me and that is all."

He was asked whether the coupe ever went off the road and then back, and he said, "I didn't see nothing, I looked up and the bus hit us right then."

If he had seen the bus cut over to the right, it is reasonable to assume that he would have said so. Immediately after Mr. Ipes left the stand, Mrs. Fogleman, the plaintiff, was recalled and questioned by her counsel.

Although she had said nothing in her first examination about the bus's turning to the right and although the trial judge had indicated by questioning Mr. Ipes that he thought the question whether the bus had turned to the right too quickly was highly material, counsel did not question her about the point, and she said nothing about it. And, after the defendant had closed its case, Miss Durbin, the driver of the car, was recalled by counsel for plaintiff. But she was not questioned as to this point and said nothing about it.

A man named Homer Perkins testified for plaintiff. He said he was driving a log truck along the road and that a car and later a bus passed him; that they went on ahead of him about 75 or 100 yards when the bus "started passing the car and the car was on the right hand side of the road, and the bus started by the car and cut back and somewhere along about the middle of the bus or behind caught the front of the car and they went together." He said the "car was fully on the right hand side of the black mark". He said he was about 125 or 150 yards away when the cars collided. He said, "It looked to me like it cut back too quick and hung on the front of the car."

He said he drove his truck on up the road, passed the wrecked car and the bus, stopped his truck, and walked back to the scene, but spoke to no one and offered no help.

Whether this man Perkins was there and saw the accident as he said he did is a disputed question. He is the only one who said he was there. No one saw him there. He says he spoke to no one. The occupants of the car did not see him, of course, because they were in the wrecked car. But, if their car had passed his log truck just before the collision, they would have known that, yet they said nothing about it. The bus driver and the four passengers thereon were questioned as to whether he was there, and each said he was not, or at least, if he were, they did not see him, and each testified positively that the bus did not pass a log truck or any other vehicle just before the collision. The testimony as a whole makes it extremely doubtful that Perkins was there.

Defendant called five witnesses who were on the bus at the time of the collision. One was J. A. McKenzie, the driver. The others were Mrs. Mimms, Mrs. Dufour, Mrs. Reiszner, and Mr. Casteix, who were passengers on the bus. These passengers, as disclosed by the record, are all intelligent people of good standing. They said they had no interest in the outcome of the litigation. Mrs. Mimms is the daughter of a merchant and the wife of a rice farmer. She was not acquainted with the bus driver, nor with any of the insurance adjustors. She said she was riding on the right-hand side of the bus in the second seat from the front; that she was looking ahead through the windshield, saw the coupe before the bus reached it; that the car was on its right-hand side of the road; that the driver sounded his horn as a signal that he intended to pass; that the bus pulled over to the left of the road and, as it was in the act of passing the car, was

on the left-hand side of the black line, and that the car was on the right-hand side of it. She was asked, "When the bus driver pulled out to pass the car, what happened?" Her reply was:

"When he started to pass, the car was on the right side of the black line, the car then pulled out on the shoulder slightly and then cut back on to the road, and at that time pulled too far in and hit the bus."

She said that, while the bus was in the act of passing the car, she was not looking at the black line in the road but was looking at the car on the right through the window by which she was sitting; that, when the car hit the side of the bus, it swerved to the right and went off the road, and that she then looked ahead through the windshield to see what was going to happen to the bus, and that, when she looked ahead, the bus was still on the left of the black line, but, after the collision and after the car left the road, the bus went to the right-hand side of the road and stopped.

Mrs. Dufour, another passenger, is a stenographer and lives in Lake Charles, where she is employed by the Fire Insurance Adjustment Bureau. She said her employer did not represent the insurer in this case. She was sitting next to the window on the right-hand side of the bus about four seats from the front. She paid no attention to the black line but said she knew that the bus was on its side of the road and that the coupe was on its side. While the bus was in the act of passing the coupe, she said she was looking through

the bus window at the car and saw that it was "zigzagging", that it "was going slightly from side to side"; "it was wabbling"; and that in one of the side-to-side movements it hit the bus. She swore positively that the bus did not turn to the right of the road until after the collision and after the coupe had gone off the road.

Mrs. Reiszner, another passenger, teaches school near Sulphur, La., and lives in Alexandria. She occupied the first seat behind the driver. She did not notice the coupe particularly, nor the black line in the road, but said the driver did sound the signal to pass. She said she was looking out through the left-hand corner of the window and knew that the bus was on its side of the road. As the bus was passing the car, she heard a "screeching sound" and said she turned and saw the car turn over. She said the bus was going straight on its side of the road. When asked whether the bus cut to the right while passing the car, she did not answer yes or no but said that the bus was "going straight".

Mr. Casteix, another passenger, was going to Alexandria. He is a state employee working at the Central Louisiana State Hospital at Pineville as ward attendant and general utility man. He occupied a seat on the left-hand side of the bus and was looking ahead through the windshield. He said the bus was traveling straight on its side of the road. His testimony differs from that of the other passengers in this: He said the bus passed the car, got ahead a car's length; that the car apparently speeded up in order to pass the bus and ran into the side of it.

McKenzie, the bus driver, said he gave the signal to pass as he approached the car; that the driver apparently heard the signal, for he saw the car turn slightly to the right. He said he pulled over to the left side of the pavement and passed the car while the bus was on its side of the road, went straight ahead and did not turn to the right until after the collision. He, like the passenger Casteix, said that the bus passed the car, that the car speeded up apparently to pass the bus and ran into the side of the bus. In this respect these two witnesses were not in accord with the three women passengers.

But all five of these witnesses testified positively that the collision was not caused by a turn of the bus to the right. Counsel for plaintiff criticizes the testimony of the passengers. He says that they probably were not looking. But they say they were, and no reason is suggested why they should not be believed.

Aside from the above testimony is this, which is significant. Miss Durbin, the driver of the car; Mr. Ipes, the owner of it, and the plaintiff were picked up, put on the bus, and carried to Oakdale. Miss Durbin was badly shaken up and for a while was unconscious. Mrs. Mimms says that, when they entered the bus, she moved from her seat to the one directly opposite and that Mr. Ipes and Miss Durbin then occupied the seat she had before. She says she heard Miss Durbin ask Mr. Ipes what had happened and heard his reply, which was "you ran into the bus".

Mrs. Dufour, the stenographer, says that she was in the seat behind Miss Durbin and Mr. Ipes and heard a conversation between them; that Miss Durbin wanted to know what had happened, and Mr. Ipes said to her, "you hit the bus". Mrs. Reiszner, the teacher, said she heard the conversation but paid no attention to what was said. Mr. Casteix said, "I heard the little lady that was driving the coupe say something to the man, what happened. He said we ran into the bus."

Miss Durbin, when recalled, said she did not remember the conversation; that, if she said anything about the accident, she could not recall it. Mr. Ipes was asked on direct examination whether he did not recall that he had a conversation "with Miss Durbin in the bus and Miss Durbin asked you what happened and you told her you ran into the bus". He answered, "No sir."

I can imagine no reason why these passengers, all of good standing and seemingly intelligent, should deliberately swear falsely in this case in which they have no interest at all. It may be suggested that the occupants of the car should not be accused of doing so. Nothing said in this opinion is intended as such accusation. The fact is that they did not testify positively about anything that happened except that their car was well over on its right side and half of the road. When questioned about the details, they invariably said they did not know or could not remember. Mr. Ipes on one occasion said, "I didn't see nothing, I looked up and the bus hit us right then."

As to plaintiff's theory and contention that the bus driver turned to the right too soon, the testimony that he did not unques-

tionably outweighs the testimony that he did. Besides, there seems to have been no reason why he should have done so. It was daylight, the road was straight and level, and there is no testimony that a vehicle was in sight approaching from the opposite direction.

Now as to skid marks. At the time of the collision, the concrete pavement was dry. It is undisputed that these marks began over on the left-hand side of the black line which ran down the center of the 18-foot concrete pavement. From there they ran up the pavement diagonally to the right a distance of about 35 or 40 feet to the edge of the pavement. From that point there were markings and "furrows" on the ground up to where the coupe came to rest. The witnesses traced the pathway of the coupe from where the skid marks began on the west side of the black line to the edge of the pavement and thence directly on to where it had stopped. It is not disputed that these skid marks were made by the wheels of the coupe, nor that the marks began at the spot where the brakes were applied. The brakes seem to have been used to full capacity. All four wheels skidded. They were evidently locked.

Willie Byrd, an automobile mechanic who works for a garage at Oakdale, picked up the wrecked car and examined the marks on the road. He said rubber was "burned into the road".

Counsel for plaintiff brought out from this witness that rubber would not have been burned on the road if the brakes had

not been applied. He then asked the witness whether there was any way of determining whether the brakes were applied after the collision or before, and he said there was not. The theory of defendant's counsel was that the brakes were applied and the skid marks made after the collision and when the driver of the coupe was trying to hold it on the road.

It was then clear that the question as to when the brakes were applied was highly important. The witness, Willie Byrd, was the last one called by defendant. After it closed its case, counsel for plaintiff recalled Miss Durbin, the driver of the coupe, in rebuttal, and asked her, "When if at any time did you apply the brakes on your car?" She answered, "When the bus was behind us, Mrs. Fogleman told me about it and I applied the brakes and got on my side of the road." She said she had not applied them before. Plaintiff's counsel then asked her, "You applied the brakes as you turned over?", and she said, "Yes sir, when she told me." The witness was not cross-questioned, and both sides closed.

This is the only testimony in the record relating to the question as to when the brakes were applied. According to this testimony, they were applied when the bus was behind the coupe and as the driver "turned over". Miss Durbin did not state that she used the brakes after that.

If this is the only time that Miss Durbin applied the brakes, it is evident that the collision could not have taken place in the manner plaintiff's counsel claim it did. The

reason is plain. The skid marks began when the brakes were applied, and the coupe immediately turned to the right and went off the road entirely within the short distance of 35 or 40 feet. If this theory is correct, the coupe must have gone off the road in less time than it would have taken the bus to overtake it. Besides, the coupe was traveling sharply to the right moving out of the way of the bus. So, if the driver of the coupe applied the brakes only one time and then when the bus was behind, there could have been no collision.

But there was a collision, and there must be some reasonable explanation as to why there was. Miss Durbin no doubt applied the brakes when she said she did, but she evidently applied them again, at a later time. It is unreasonable to assume that the skid marks were made when she says she applied the brakes. They were made, according to the witnesses who examined them, by locked wheels, after the brakes were applied to full capacity. There was no reason so to apply them when the purpose was merely to "turn over". It is more reasonable to assume that the brakes were jammed on and the marks made after the emergency arose. The emergency arose not when Miss Durbin was informed that the bus was approaching from behind, but when the collision occurred. It was then necessary to apply the brakes to full capacity in order to hold the car in the road. Evidently then is when the skid marks were made. This corroborates the testimony of the passengers on the bus that Miss Durbin lost control of the coupe while the bus was running along by the side of it and that the coupe wabbled and zigzagged and finally got too far over and came in contact with the passing bus.

For these reasons, I respectfully dissent.